UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.:____________

SHANNON BIEBER,
Plaintiff,

v.

BLUE ORIGIN, LLC a Florida
Limited Liability Company,
Defendant.
_________________________________/

**COMPLAINT**

COMES NOW, Plaintiff, SHANNON BIEBER ("BIEBER"), files her Complaint against Defendant, BLUE ORIGIN, LLC ("BLUE ORIGIN"), alleging violations of the American with Disabilities Act 42 USC §12101, et seq. ("ADA"), the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, et seq. ("FCRA"), and Florida Private Whistleblower Act, Fla. Stat. § 448.102 ("FPWA"), and alleges as follows:

**JURISDICTION & VENUE**

1. This action is brought to remedy unlawful employment practices by BLUE ORIGIN in violation of the ADA, FCRA, and FPWA.



CADOGAN LAW | 1200 S. PINE ISLAND ROAD, SUITE 370 | PLANTATION, FL 33324 | T: 954.606.5891 | WWW.CADOGANLAW.COM

2. This Court has federal jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over BIEBER's state law claims pursuant to 28 U.S.C. § 1367(a), as they are so related to the federal claims that they form part of the same case or controversy.

3. Venue is proper in this District as a substantial part of the events giving rise to the claims occurred and/or were committed in Brevard County, Florida.

4. BIEBER is *sui juris* and was employed by BLUE ORIGIN in this District.

5. BLUE ORIGIN is a Florida limited liability company doing business in this District.

6. At all relevant times, BIEBER performed work for BLUE ORIGIN in this District.

## CONDITIONS PRECEDENT

7. All conditions precedent have been satisfied or waived, including the dual filing of Charges of Discrimination with the EEOC and FCHR, and the elapse of 180 days and/or receipt of the EEOC's Right to Sue Letter.

8. The FCHR issued its Determination of Reasonable Cause on July 1, 2026.

9. On February 13, 2026, in writing, counsel for BIEBER requested that BLUE ORIGIN advise whether BIEBER was bound by an Arbitration Agreement. BLUE ORIGIN contends that an Arbitration Agreement exists, but despite repeated requests both to BLUE ORIGIN's in-house attorney, Sree Lopez, Esq., and its outside counsel, Harry Korrel, Esq. and Katie Loberstein, Esq., and the passage of **196** days since that BIEBER's initial request, BLUE ORIGIN has failed to provide a copy of the purported arbitration agreement entered into by the parties.

## GENERAL ALLEGATIONS

***Employment:***

10. On or around May 5, 2025, BLUE ORIGIN hired BIEBER as an HR Partner, supporting a substantial portion of operations.

11. At all relevant times, BLUE ORIGIN was an "employer" within the meaning of ADA and FCRA.

12. At all relevant times, BIEBER was an "employee" and "qualified individual" as defined by the ADA and FCRA.

13. By all accounts, BIEBER was a high performing employee who handled complex employee relations matters, managed enterprise projects, fulfilled operational responsibilities, worked extended hours, and had no history of disciplinary issues.

***Disability:***

14. BIEBER suffers from multiple qualifying disabilities under the ADA, including ADHD, anxiety, and anorexia nervosa, which substantially limit major life activities including concentration, focus, eating, thinking, regulating emotions, and managing stress. *See Wey v. City of St. Petersburg*, No. 8:19-CV-1314-T-60JSS, 2020 WL 7229752 (M.D. Fla. Dec. 8, 2020); *Doers v. Lincare, Inc.*, No. 8:14-CV-3168-T-30AEP, 2016 WL 853102 (M.D. Fla. Mar. 4, 2016); *Meisenhelder v. Florida Coastal Sch. of Law, Inc.*, No. 3:09-CV-0074-HES-TEM, 2010 WL 2028089 (M.D. Fla. Feb. 19, 2010), aff'd, 395 Fed. Appx. 669 (11th Cir. 2010); *Shalbert v. Marcincin*, No. CIV.A.04-5116, 2005 WL 1941317 (E.D. Pa. Aug. 9, 2005).

15. As a result, open-office environments with high stimulation, noise, and constant interruptions exacerbate BIEBER's symptoms and create unsustainable health risks.

***Building "A" & Maintenance Building:***

16. BLUE ORIGIN's facility includes multiple buildings.

17. "Building A" is a three-story building, housing several hundred employees in an open-office environment.

18. The "Maintenance Building" is a single-story building with approximately 40-50 employees in a quieter, lower-distraction environment.

19. Upon starting her employment at BLUE ORIGIN, BIEBER performed her duties in Building A.

20. The overstimulating environment in Building A, with constant noise, movement, and unplanned interruptions, worsened BIEBER's ADHD, anxiety, and anorexia nervosa, impairing her ability to complete tasks efficiently and often requiring her to work outside normal hours.

21. BIEBER's client group was not based in Building A, they were distributed across multiple buildings and Florida site locations, and she routinely supported them by traveling to client buildings and conducting virtual meetings.

22. Accordingly, on or around September 24, 2025, with the approval of her supervisor, Ms. Bianca Benjamin-Flanders (Director of Employee Relations),

BIEBER relocated to a quiet desk in the Maintenance Building as a job accommodation, where she was able to perform her job functions effectively.

23. On October 15, 2025, BIEBER submitted an ADA accommodation request to BLUE ORIGIN, seeking (a) full-day access to quiet workspace in the Maintenance Building, (b) limited Building A attendance for essential meetings only, and (c) access to quiet cafeteria/break area to specifically address her anorexia nervosa.

***Failure to Accommodate:***

24. Within five (5) days of BIEBER's ADA accommodation request, on October 20, 2025, Ms. Benjamin-Flanders imposed a new requirement that BIEBER spend approximately half of her workday in Building A.

25. The following day, on October 21, 2025, Ms. Benjamin-Flanders began monitoring BIEBER's location and pressuring her to comply via instant messaging.

26. On October 22, 2025, Ms. Benjamin-Flanders threatened BIEBER, stating she was considering permanently revoking her quiet desk and suggesting that, perhaps, "Blue Origin isn't for you [BIEBER]."

27. On October 23, 2025, merely eight (8) days after BIEBER's ADA accommodation request, Ms. Benjamin-Flanders issued BIEBER a written warning

and verbal coaching via email, falsely claiming that she had been required to spend time daily in Building A since September and improperly characterizing her conduct as noncompliant.

28. In the same October 23, 2025, communication, Ms. Benjamin-Flanders warned BIEBER that failure to comply with the directive to work from Building A would result in additional discipline, despite her knowledge that the environment exacerbated BIEBER's symptoms and impaired her ability to concentrate and perform her job duties.

29. In support of her ADA accommodation request, on October 24, 2025, BIEBER submitted a Provider Medical Certification Form completed and signed by her treating psychologist, Dr. Wieslaw Faliszeweski, which documented her medical conditions and accommodation needs, including a recommendation for medical leave from work.

30. The Provider Medical Certification Form further confirmed the health risks related to her current high stimulus work environment and the associated stress caused by BLUE ORIGIN, and certified BIEBER's need for intermittent and continuous leave due to the chronic and variable course of her conditions.

31. From October 27, 2025, through November 26, 2025, BIEBER took approved medical leave due to the stress and health risks exacerbated by her work environment at BLUE ORIGIN.

32. BIEBER's leave was extended from November 27, 2025, through January 4, 2026, though this extension was initially denied by BLUE ORIGIN and only approved after BIEBER contested the denial.

33. On November 19, 2025, Ms. LaTrisha Smith (Senior Leaves Accommodation Specialist) notified BIEBER that her request for reassignment to a different building had been denied, without any evidence that the request would pose an undue burden or hardship.

34. Throughout the interactive process, BLUE ORIGIN failed to engage in good faith discussions regarding BIEBER's ADA accommodation request and instead offered wholly inadequate alternatives that did not meet her medical needs.

35. BLUE ORIGIN's proposed "accommodations" included:

a. Use of a shared phone booth in Building A that lacked a ceiling, soundproofing, power outlets, and prohibited food and drink;

b. Primary desk remains in Building A, with conditional "as needed" access to the Maintenance Building; and

c. Requirement to spend at least two (2) days per week in Building A.

36. BIEBER declined each of BLUE ORIGIN's proposed accommodations, advising BLUE ORIGIN on each occasion that the proposal did not properly address or satisfy her medical limitations, and sought to continue good faith discussions to put in place reasonable accommodations in order for her to perform her essential job functions without causing her harm on account of her impairments.

37. Every accommodation offered by BLUE ORIGIN was conditioned on BIEBER's continued exposure to the high-stimulation Building A environment, which directly contradicted her medical provider's recommendations and exacerbated her medical conditions.

38. BLUE ORIGIN failed to provide any operational justification for denying BIEBER's requested accommodation, despite her demonstrated ability to perform her role effectively from the Maintenance Building.

***Differential Treatment:***

39. Other HR Partners outside of Bieber's protected classification were not required to split their workday between multiple buildings or physically co-locate with their assigned client groups, often supporting client groups across different states.

40. BIEBER's peer Employee Relations Specialist, Jazzmin McKie, served the same client group as BIEBER and worked full-time in the Maintenance Building.

41. The fixed-term HR Partner covering BIEBER's client group while she was on approved medical leave held no Building A desk and conducted no in-person meetings there.

42. During the interactive process, BLUE ORIGIN posted an HR Partner job requisition with no Building A requirement, listing the identical role as performable in Merrit Island, Florida, Huntsville, Alabama, or Kent, Washington.

43. On or around December 23, 2025, BIEBER sought an additional extension of medical leave through February 2, 2026, supported by medical documentation certifying continued medical necessity for treatment and stabilization.

***Retaliation after Filing of Charges of Discrimination:***

44. As a result of BLUE ORIGIN's ongoing conduct, on January 1, 2026, BIEBER filed dual discrimination charges with the Florida Commission of Human Relations ("FCHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging disability discrimination, failure to accommodate, and retaliation.

45. On January 7, 2026, the FCHR issued a Notice of Receipt confirming BIEBER's filing.

46. The very next day, on January 8, 2026, Mr. Ken Johnson (Senior Leaves Program Manager) informed BIEBER that BLUE ORIGIN denied her request for an extension of leave as a reasonable accommodation without providing any explanation.

47. The fixed term HR Partner fully supporting BIEBER's client group was scheduled through at least March 2026.

48. Following BIEBER's demand for a specific basis of the denial on January 11, 2026, Mr. Johnson stated only that maintaining a presence in Building A is an essential function of her role.

***Termination:***

49. On January 12, 2026, while BIEBER remained on approved medical leave, she received a COBRA Notice reflecting a loss of benefit eligibility effective January 1, 2026—demonstrating BLUE ORIGIN's blatant violation of her civil rights and pretextual nature of the adverse job actions.

50. On January 13, 2026, while BIEBER remained on approved medical leave, BLUE ORIGIN presented her with an ultimatum to either return to work with inadequate accommodation or accept severance of only two weeks' pay, contingent upon a separation agreement with a release of claims.

51. BIEBER returned to work on January 19, 2026, against medical advice, without a compliant accommodation in place, and without the fitness for duty clearance required by BLUE ORIGIN's own policies, since she was scared to lose her job and accompanying health insurance.

52. On January 23, 2026, merely four (4) days after returning to work, BLUE ORIGIN issued a Notice of Termination of BIEBER's employment, alleging a violation of its Information Security Policy and Standards.

53. Pursuant to the Notice of Termination, BLUE ORIGIN claimed that BIEBER violated the Information Security Policy and Standards by transmitting "confidential company information to an email address outside Blue Origin."

54. To the contrary, BIEBER forwarded copies of her own ADA accommodation requests and medical leave materials to her personal email account to preserve evidence in anticipation of litigation, not proprietary business information.

## ATTORNEYS' FEES

55. BIEBER has retained the undersigned law firm to represent her in this action and has agreed to pay the firm reasonable fees for its services.

## COUNT I – DISABILITY DISCRIMINATION IN VIOLATION OF ADA

56. BIEBER realleges and reavers the allegations set forth in Paragraphs 1 through 54 as if fully set forth herein.

57. At all times material hereto, BIEBER had disabilities within the meaning of the ADA, including ADHD, anxiety, and anorexia nervosa.

58. At all times material hereto, BIEBER was qualified to perform the essential functions of her position as HR Partner, as demonstrated by her exemplary performance and absence of any disciplinary record.

59. On October 15, 2025, BIEBER submitted her ADA accommodation request to BLUE ORIGIN, seeking (a) full-day access to quiet workspace in the Maintenance Building, (b) limited Building A attendance for essential meetings

only, and (c) access to quiet cafeteria/break area to specifically address her anorexia nervosa.

60. In support of her request, BIEBER provided BLUE ORIGIN with a Provider Medical Certification Form confirming the health risks related to her current high stimulus work environment and the associated stress caused by BLUE ORIGIN.

61. In response to BIEBER's ADA accommodation request, BLUE ORIGIN took the following adverse actions, including but not limited to:

a. Imposed punitive Building A requirements five (5) days after BIEBER's accommodation request;

b. Micro-managed BIEBER's whereabouts;

c. Threatened to permanently revoke BIEBER's quiet workspace seven (7) days after her accommodation request;

d. Issued a fabricated disciplinary warning against BIEBER eight (8) days after her accommodation request;

e. Offered alternative accommodations that it knew were wholly insufficient as each remained conditioned on BIEBER's continued exposure to Building A;

f. Denied BIEBER's request for medical leave extension in direct contravention of her medical provider's advice and documentation;

g. Presented BIEBER with an ultimatum to either return to work with an inadequate accommodation or forfeit her position in exchange for severance; and

h. Terminated BIEBER's employment while she was on approved medical leave.

62. Prior to submitting her accommodation request, BIEBER was authorized to work in the Maintenance Building.

63. The close temporal proximity between BIEBER's ADA accommodation request and the adverse actions taken against her, including the immediate imposition of the Building A requirement while other similarly situated HR Partners were not subject to such a requirement, constitutes unlawful disability discrimination.

64. This conclusion is further corroborated by BLUE ORIGIN's premature processing of BIEBER's COBRA benefits while she remained on approved medical leave and prior to any formal termination, demonstrating that

her termination was predetermined, pretextual, and the product of unlawful disability discrimination.

65. BLUE ORIGIN's discriminatory conduct was willful, intentional, and in violation of the ADA.

66. As a direct and proximate result of BLUE ORIGIN's disability discrimination in violation of the ADA, BIEBER has suffered and continues to suffer damages.

## COUNT II – FAILURE TO ACCOMMODATE IN VIOLATION OF ADA

67. BIEBER realleges and reavers the allegations set forth in Paragraphs 1 through 54 as if fully set forth herein.

68. At all times material hereto, BIEBER had disabilities within the meaning of the ADA, including ADHD, anxiety, and anorexia nervosa.

69. At all times material hereto, BIEBER was qualified to perform the essential functions of her position as HR Partner, as demonstrated by her exemplary performance and absence of any disciplinary record.

70. BLUE ORIGIN had actual knowledge of BIEBER's qualifying disabilities by virtue of her ADA accommodation request on October 15, 2025, and the medical documentation she provided in support.

71. On October 15, 2025, BIEBER requested the following accommodation for her known disabilities: (a) full-day access to quiet workspace in the Maintenance Building, (b) limited Building A attendance for essential meetings only, and (c) access to quiet cafeteria/break area to specifically address her anorexia nervosa.

72. BIEBER's requested accommodation was reasonable as it would have enabled her to perform the essential functions of her position without imposing an undue hardship on BLUE ORIGIN, as evidenced by both her previously approved and successful performance from the Maintenance Building and other HR Partners not being subjected to any Building A requirement.

73. Despite the foregoing, BLUE ORIGIN denied BIEBER's accommodation request and instead offered wholly inadequate alternatives that were conditioned on continued exposure to the high stimulation environment in Building A that exacerbated her disabling conditions.

74. BLUE ORIGIN's failure to provide reasonable accommodation caused BIEBER's conditions to worsen, necessitating BIEBER to seek an extension of medical leave through February 2, 2026, supported by medical documentation certifying continued medical necessity for treatment and stabilization.

75. On January 8, 2026, BLUE ORIGIN denied BIEBER's request for an extension of leave as a reasonable accommodation without providing any explanation.

76. BLUE ORIGIN's failure to accommodate BIEBER's disabilities was willful, intentional, and in violation of the ADA.

77. As a direct and proximate result of BLUE ORIGIN's failure to provide a reasonable accommodation, BIEBER has suffered and continues to suffer damages, including but not limited to emotional distress, mental anguish, exacerbation of her medical conditions, and other injuries.

**COUNT III – RETALIATION IN VIOLATION OF ADA**

78. BIEBER realleges and reavers the allegations set forth in Paragraphs 1 through 54 as if fully set forth herein.

79. BIEBER engaged in the following protected activities under the ADA:

a. Submitted her formal ADA accommodation request on October 15, 2025;

b. Internally reported BLUE ORIGIN's failure to comply with the ADA on multiple occasions;



CADOGAN LAW | 1200 S. PINE ISLAND ROAD, SUITE 370 | PLANTATION, FL 33324 | T: 954.606.5891 | WWW.CADOGANLAW.COM

c. Requested a medical leave extension on or around December 23, 2025; and

d. Filed dual discrimination charges with the FCHR and EEOC on January 1, 2026.

80. Following BIEBER's engagement in the foregoing protected activities, BLUE ORIGIN subjected her to the following:

a. Imposed punitive Building A requirements within five (5) days of her accommodation request;

b. Micro-managed BIEBER's whereabouts;

c. Threatened to permanently revoke her quiet workspace seven (7) days after her accommodation request;

d. Issued a fabricated disciplinary warning against her eight (8) days after her accommodation request;

e. Denied her accommodation request and failed to provide a reasonable alternative accommodation;

f. Denied her medical leave extension request one (1) day after the FCHR issued a Notice of Receipt;

g. Presented her with an ultimatum to either return to work with an inadequate accommodation or forfeit her position in exchange for severance;

h. Processed COBRA benefits while she was on approved medical leave; and

i. Terminated her employment on January 23, 2026, four (4) days after she returned to work.

81. The close temporal proximity between BIEBER's protected activities and the imposition of retaliatory measures strongly suggests that BLUE ORIGIN's actions were taken in response to BIEBER's requests for reasonable accommodations under the ADA.

82. The causal connection is further established by BLUE ORIGIN's prior approval of BIEBER's work from the Maintenance Building and imposition of Building A requirement only after she requested an accommodation; its failure to apply Building A requirement to similarly situated HR Partners; and its termination of her COBRA coverage while she remained on approved medical leave, evidencing that the decision to terminate her employment for an alleged policy violation was pretextual.

83. BLUE ORIGIN's conduct was willful, intentional, and in violation of the ADA.

84. As a direct and proximate result of BLUE ORIGIN's retaliation in violation of the ADA, BIEBER has suffered and continues to suffer damages, including but not limited to, emotional distress, mental anguish, exacerbation of her medical conditions, and other injuries.

**COUNT IV – DISABILITY DISCRIMINATION IN VIOLATION OF FCRA**

85. BIEBER realleges and reavers the allegations set forth in Paragraphs 1 through 54 as if fully set forth herein.

86. At all times material hereto, BIEBER had disabilities within the meaning of the FCRA, including ADHD, anxiety, and anorexia nervosa.

87. At all times material hereto, BIEBER was qualified to perform the essential functions of her position as HR Partner, as demonstrated by her exemplary performance and absence of any disciplinary record.

88. On October 15, 2025, BIEBER submitted her accommodation request to BLUE ORIGIN, seeking (a) full-day access to quiet workspace in the Maintenance Building, (b) limited Building A attendance for essential meetings

only, and (c) access to quiet cafeteria/break area to specifically address her anorexia nervosa.

89. In support of her request, BIEBER provided BLUE ORIGIN with a Provider Medical Certification Form confirming the health risks related to her current high stimulus work environment and the associated stress caused by BLUE ORIGIN.

90. In response to BIEBER's accommodation request, BLUE ORIGIN took the following adverse actions, including but not limited to:

a. Imposed punitive Building A requirements five (5) days after BIEBER's accommodation request;

b. Micro-managed BIEBER's whereabouts;

c. Threatened to permanently revoke BIEBER's quiet workspace seven (7) days after her accommodation request;

d. Issued a fabricated disciplinary warning against BIEBER eight (8) days after her accommodation request;

e. Offered alternative accommodations that it knew were wholly insufficient as each remained conditioned on BIEBER's continued exposure to Building A;

f. Denied BIEBER's request for medical leave extension in direct contravention of her medical provider's advice and documentation;

g. Presented BIEBER with an ultimatum to either return to work with an inadequate accommodation or forfeit her position in exchange for severance; and

h. Terminated BIEBER's employment while she was on approved medical leave.

91. Prior to submitting her accommodation request, BIEBER was authorized to work in the Maintenance Building.

92. The close temporal proximity between BIEBER's accommodation request and the adverse actions taken against her, including the immediate imposition of the Building A requirement while other similarly situated HR Partners were not subject to such a requirement, constitutes unlawful disability discrimination.

93. This conclusion is further corroborated by BLUE ORIGIN's premature processing of BIEBER's COBRA benefits while she remained on approved medical leave and prior to any formal termination, demonstrating that

her termination was predetermined, pretextual, and the product of unlawful disability discrimination.

94. BLUE ORIGIN's discriminatory conduct was willful, intentional, and in violation of the FCRA.

95. As a direct and proximate result of BLUE ORIGIN's disability discrimination in violation of the FCRA, BIEBER has suffered and continues to suffer damages.

**COUNT V – FAILURE TO ACCOMMODATE IN VIOLATION OF FCRA**

96. BIEBER realleges and reavers the allegations set forth in Paragraphs 1 through 54 as if fully set forth herein.

97. At all times material hereto, BIEBER had disabilities within the meaning of the FCRA, including ADHD, anxiety, and anorexia nervosa.

98. At all times material hereto, BIEBER was qualified to perform the essential functions of her position as HR Partner, as demonstrated by her exemplary performance and absence of any disciplinary record.

99. BLUE ORIGIN had actual knowledge of BIEBER's qualifying disabilities by virtue of her accommodation request on October 15, 2025, and the medical documentation she provided in support.

100. On October 15, 2025, BIEBER requested the following accommodation for her known disabilities: (a) full-day access to quiet workspace in the Maintenance Building, (b) limited Building A attendance for essential meetings only, and (c) access to quiet cafeteria/break area to specifically address her anorexia nervosa.

101. BIEBER's requested accommodation was reasonable as it would have enabled her to perform the essential functions of her position without imposing an undue hardship on BLUE ORIGIN, as evidenced by both her previously approved and successful performance from the Maintenance Building and other HR Partners not being subjected to any Building A requirement.

102. Despite the foregoing, BLUE ORIGIN denied BIEBER's accommodation request and instead offered wholly inadequate alternatives that were conditioned on continued exposure to the high stimulation environment in Building A that exacerbated her disabling conditions.

103. BLUE ORIGIN's failure to provide reasonable accommodation caused BIEBER's conditions to worsen, necessitating BIEBER to seek an extension of medical leave through February 2, 2026, supported by medical documentation certifying continued medical necessity for treatment and stabilization.

104. On January 8, 2026, BLUE ORIGIN denied BIEBER's request for an extension of leave as a reasonable accommodation without providing any explanation.

105. BLUE ORIGIN's failure to accommodate BIEBER's disabilities was willful, intentional, and in violation of the FCRA.

106. As a direct and proximate result of BLUE ORIGIN's failure to provide a reasonable accommodation, BIEBER has suffered and continues to suffer damages, including but not limited to emotional distress, mental anguish, exacerbation of her medical conditions, and other injuries.

**COUNT VI – RETALIATION IN VIOLATION OF THE FCRA**

107. BIEBER realleges and reavers the allegations set forth in Paragraphs 1 through 54 as if fully set forth herein.

108. BIEBER engaged in the following protected activities under the FCRA:

a. Submitted her formal accommodation request on October 15, 2025;

b. Internally reported BLUE ORIGIN's failure to comply with the ADA/FCRA on multiple occasions;

c. Requested a medical leave extension on or around December 23, 2025; and

d. Filed dual discrimination charges with the FCHR and EEOC on January 1, 2026.

109. Following BIEBER's engagement in the foregoing protected activities, BLUE ORIGIN subjected her to the following:

a. Imposed punitive Building A requirements within five (5) days of her accommodation request;

b. Micro-managed BIEBER's whereabouts;

c. Threatened to permanently revoke her quiet workspace seven (7) days after her accommodation request;

d. Issued a fabricated disciplinary warning against her eight (8) days after her accommodation request;

e. Denied her accommodation request and failed to provide a reasonable alternative accommodation;

f. Denied her medical leave extension request one (1) day after the FCHR issued a Notice of Receipt;

g. Presented her with an ultimatum to either return to work with an inadequate accommodation or forfeit her position in exchange for severance;

h. Processed COBRA benefits while she was on approved medical leave; and

i. Terminated her employment on January 23, 2026, four (4) days after she returned to work.

110. The close temporal proximity between BIEBER's protected activities and the imposition of retaliatory measures strongly suggests that BLUE ORIGIN's actions were taken in response to BIEBER's requests for reasonable accommodations under the FCRA.

111. The causal connection is further established by BLUE ORIGIN's prior approval of BIEBER's work from the Maintenance Building and imposition of Building A requirement only after she requested an accommodation; its failure to apply Building A requirement to similarly situated HR Partners; and its termination of her COBRA coverage while she remained on approved medical leave, evidencing that the decision to terminate her employment for an alleged policy violation was pretextual.

112. BLUE ORIGIN's conduct was willful, intentional, and in violation of the FCRA.

113. As a direct and proximate result of BLUE ORIGIN's retaliation in violation of the FCRA, BIEBER has suffered and continues to suffer damages, including but not limited to, emotional distress, mental anguish, exacerbation of her medical conditions, and other injuries.

## COUNT VII - VIOLATION OF THE FLORIDA PRIVATE WHISTLEBLOWER ACT, FLA. STAT. § 448.102

114. BIEBER realleges and reavers the allegations set forth in Paragraphs 1 through 54 as if fully set forth herein.

115. On January 1, 2026, BIEBER filed dual discrimination charges with the FCHR and EEOC.

116. BIEBER engaged in protected activity by submitting written disclosures to the FCHR and EEOC outlining BLUE ORIGIN's unlawful activities, policies, and practices in violation of the ADA and FCRA, including disability discrimination, failure to accommodate, and retaliation.



CADOGAN LAW | 1200 S. PINE ISLAND ROAD, SUITE 370| PLANTATION, FL 33324 | T: 954.606.5891 | WWW.CADOGANLAW.COM

117. After BLUE ORIGIN received notice of BIEBER's Charge of Discrimination on January 7, 2026, BLUE ORIGIN retaliated against BIEBER by denying her request for an extension of medical leave the very next day and subsequently terminating her employment just 16 days later under the pretext of an alleged policy violation.

118. As a direct and proximate result of BLUE ORIGIN's retaliatory actions, BIEBER has suffered damages, including but not limited to: loss of wages and benefits; loss of future earning capacity; mental anguish and emotional distress; loss of enjoyment of life; and other compensatory damages.

## PRAYER FOR RELIEF

119. As to Counts I, II, and III, Plaintiff, SHANNON BIEBER, demands judgment in her favor against Defendant, BLUE ORIGIN, LLC, for violation of the ADA and seeks damages, including backpay, frontpay, compensatory damages if greater than awarded under the FCRA, punitive damages if greater than under the FCRA, interest, and such other relief that this Court deems just and proper.

120. As to Counts IV, V and VI, Plaintiff, SHANNON BIEBER, demands judgment in her favor against Defendant, BLUE ORIGIN, LLC, for violation of the FCRA and seeks damages, including backpay, frontpay, compensatory damages

if greater than under the ADA, punitive damages if greater than under the ADA, interest, and such other relief that this Court deems just and proper.

121. As to Count VII, Plaintiff, SHANNON BIEBER, demands judgment in her favor against Defendant, BLUE ORIGIN, LLC, for violation of the FPWA Fla. Stat. § 448.102 and seeks damages, including back pay, front pay, compensatory damages, interest, attorneys' fees and costs, and such other relief that this Court deems just and proper.

122. Attorneys' fees pursuant to 42 USC § 12205 and Fla. Stat. § 760.11.

123. Costs pursuant to 42 USC § 12205, Fla. Stat. § 760.11 and 28 USC § 1920.

**JURY TRIAL DEMAND**

Plaintiff, SHANNON BIEBER respectfully requests a trial by jury on all issues so triable.

**AI CERTIFICATE**

The undersigned hereby certifies that generative artificial intelligence, Eve Legal, ____ was/__X__ was not used to assist with compiling documents in support of the client's position. The undersigned has independently verified the accuracy of every citation to the law and/or the record, and the accuracy of any language drafted by generative artificial intelligence, including quotations, citations, paraphrased assertions, facts, and legal analysis.

Dated: August 25, 2026

Respectfully submitted,

By: */s/ Madison A. Heckman*
GINA MARIE CADOGAN
Fla Bar No: 177350
MADISON HECKMAN
Fla Bar No: 1050048
CADOGAN LAW
1200 S. Pine Island Road, Suite 370
Plantation, Florida 33324
Telephone: 954.606.5891
Facsimile: 877.464.7316
Email: gina@cadoganlaw.com
Email: madison@cadoganlaw.com
Email: tyler@cadoganlaw.com